```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA,               :
                                        :
                -v-                     :        08 Cr. 10 (DLC)
                                        :
LEONARDO MONTES-REYES,                  :        OPINION AND ORDER
                        Defendant.      :
                                        :
----------------------------------------X
```

Appearances:

For the United States of America:
Michael M. Rosensaft
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007

For Defendant Leonardo Montes-Reyes:
Mark B. Gombiner
Federal Defenders of New York
52 Duane Street - 10th Floor
New York, NY 10007

DENISE COTE, District Judge:

This Opinion addresses whether consent to enter a hotel room and conduct a search is voluntary when given in response to a law enforcement ruse asserting an emergency. Defendant Leonardo Montes-Reyes ("Montes-Reyes") has moved to suppress the fruits of the search of his hotel room on December 19, 2007, including statements made prior to and following his arrest on that date. For the following reasons, the defendant's motion is granted.

BACKGROUND

The following findings of fact are drawn from the testimony and evidence provided at a hearing held on April 7, 2008, during which the Government presented testimony from two law enforcement officers who participated in the search and arrest, Drug Enforcement Agency ("DEA") Agent Marlow Luna ("Agent Luna"), and New York State Special Investigator Hector Fernandez ("Investigator Fernandez"). On December 19, 2007, members of a DEA task force that included New York State investigators and local police were conducting surveillance of Montes-Reyes at the Newton Hotel on 95th Street and Broadway in Manhattan. At some time between 5:00 and 6:00 p.m., Agent Luna and another officer, Raymond Donovan, knocked on the door of room 814 of the hotel, in which they knew Montes-Reyes was staying. Approximately eight other law enforcement agents were nearby in the hallway.

When Montes-Reyes opened the door, Agent Luna identified himself as a police officer, and displayed a New York City Police Department detective's badge. Speaking to Montes-Reyes in Spanish, Agent Luna told Montes-Reyes that he was looking for a missing girl, and showed him a flier from the National Center for Missing and Exploited Children that contained two photographs -- on the left, a picture of a girl, approximately four years old, and on the right, a picture of a woman next to the caption "Abductor." On the top of the page, in large, bold

letters was the phrase "Endangered Missing."[1]  Agent Luna asked
if he could enter Montes-Reyes's room to check for the missing
girl, and Montes-Reyes consented.  What Montes-Reyes did not
know at that time, however, was that Agent Luna was a DEA agent
and not a police officer, and that he was not looking for the
missing girl; rather, he wished to search Montes-Reyes's room
for evidence of drug dealing, and had determined to use this
ruse to obtain Montes-Reyes's consent to search the room.[2]

    Having obtained Montes-Reyes's consent, Agents Luna and
Donovan entered the room and looked around for "a few seconds"
to see if any one else was present.  At this time, three more
agents also entered the room, including Investigator Fernandez.
The hotel room was small, containing a bed, a short table with a
lamp, and a desk/dresser; immediately to the right of the
entrance to the room was also a door leading to a small
bathroom.  With the entry of the five officers, it was "an
extremely crowded situation."

---

[1]  There is no evidence in the record regarding Montes-Reyes's
ability to read English.  The flier, however, is clearly
recognizable from its layout as a flier relating to a missing
child.  Combined with the fact that the police appeared to be
actively searching for the four-year-old girl depicted on the
flier, the scenario presented to Montes-Reyes conveyed a sense
of urgency and danger similar to that conveyed by the phrase
"Endangered Missing."

[2] This is not to say that the girl pictured was not, in fact,
missing at that time.  The release entered into evidence, which
Agent Luna testified that he showed the defendant, appears to be
genuine.

After or during his brief look around the room, Agent Luna asked Montes-Reyes if there were any guns in the room, and he responded that there were not.  When Agent Luna asked if the officers could search for guns, Montes-Reyes said that they could.  Montes-Reyes was then given DEA form 88a, written in Spanish, entitled "Consent to Search."  The form contains three pre-printed statements.  The first reads, "I have been requested to authorize special agents of the Drug Enforcement Agency to search"; following this text is, in Agent Luna's handwriting, "room 814 in the Newton Hotel, 2528 Broadway, New York, NY." The next two pre-printed statements read, "I have not been threatened or forced in any way," and "I consent freely to this search."  Montes-Reyes reviewed this form, then signed and dated it; the form was also signed by Agent Luna and one other person. Only a few minutes had passed between the time of the knock on the door and the signing of the form.

During the initial search and conversation, the agents noticed a black bag on the floor, near the foot of the bed. Agent Luna asked Montes-Reyes if he could search the black bag to see if there were any guns in it, and Montes-Reyes consented to such a search.[3]  Agent Luna then picked up the bag, which he

---

[3] Agent Luna's testimony was inconsistent with respect to whether Montes-Reyes signed the consent form prior to or after he was asked for consent to search his bag.  Agent Luna initially testified that Montes-Reyes signed the form after he asked for

4

found to be extremely heavy.  He and Investigator Fernandez
opened it, and detected a strong odor that, in Agent Luna's
experience, was consistent with heroin.  Inside the bag were
numerous items of clothing, which were damp.  Agent Luna also
noticed that there was a "powdery substance" in the lining of
some of the clothing.  Upon questioning from Agent Luna
regarding the contents of the bag, Montes-Reyes stated that he
knew that the bag contained something illegal, and that he had
been paid to bring the bag to New York City.  Montes-Reyes was
then placed under arrest and read his <u>Miranda</u> rights in Spanish.
He orally waived those rights and repeated the substance of his
earlier statements.  (He also added that this was not the first
time that he had engaged in such acts.)  Upon being taken to DEA
headquarters, he also signed a form waiver of his <u>Miranda</u>
rights, and made further statements also consistent with his
earlier account.

---

permission to search the bag, but having been confronted with
his grand jury testimony, as well as his investigative report
(prepared on December 20, 2007), he stated that, in fact,
Montes-Reyes had signed the form while standing in the doorway
of the room.  Investigator Fernandez testified, however, that
while he could not understand the Spanish conversation between
Agent Luna and Montes-Reyes, the form was signed near the desk,
inside the room, and not while standing in the door.  Having
heard the testimony provided by Agent Luna and Investigator
Fernandez, I find that Agent Luna asked Montes-Reyes to sign the
consent form while standing inside the room.  As noted below,
however, this issue is not decisive in any event.

During these events Montes-Reyes was calm and appeared to understand what was happening.  No threats were made toward him and the officers never drew their guns while they were in the hotel room.

DISCUSSION

In this case, Montes-Reyes gave three separate consents to search: (1) his oral consent for the agents to enter the room; (2) his written consent for the search of "room 814"; and (3) his oral consent to search in his bag for guns.  In order to determine if any of these expressions of consent are sufficient to permit the use in this case of the physical and oral evidence obtained during the resulting search, the circumstances in which each consent was given must be analyzed using the standards outlined below.

I.    Consent to Search the Hotel Room

A.    Fourth Amendment Principles

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., amend. IV.  In sum, "[t]he Fourth Amendment protects the right of private persons to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy." United States v. Snype, 441 F.3d 119, 130 (2d Cir. 2006) (citation omitted).  Thus, "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." Kyllo v. United States, 533 U.S. 27, 31 (2001).[4]

One such exception is made "when the search is conducted pursuant to the consent of an authorized person." Snype, 441 F.3d at 130 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).  The consent exception seeks a balance between, on the one hand, the "values reflecting the concern of our society for the right of each individual to be let alone," and, on the other, the reality that "[i]n situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence." Schneckloth, 412 U.S. at 228, 242 (citation omitted).  This balance is achieved by requiring that such consent "not be

---

[4] These protections apply to Montes-Reyes as "a guest in a hotel room" just as they apply to "a tenant of a house, or the occupant of a room in a boarding house." Stoner v. California, 376 U.S. 483, 490 (1964); see also Hoffa v. United States, 385 U.S. 293, 301 (1966) ("A hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office."). The Government does not contend otherwise.

coerced, by explicit or implicit means, by implied threat or
covert force." Snype, 441 F.3d at 130-31 (quoting Schneckloth,
412 U.S. at 228).[5]  In other words, the consent must be "the
product of an essentially free and unconstrained choice,"
Schneckloth, 412 U.S. at 225 (citation omitted), i.e., it must
be "'voluntarily' given." Id. at 223.  Through the application
of these standards, "[t]hose searches that are the product of
police coercion can . . . be filtered out without undermining
the continuing validity of consent searches." Id. at 299.

     When seeking to admit evidence obtained as a result of a
consent search, "the government . . . bears the burden of
proving by a preponderance of the evidence that the consent was
voluntary." Snype, 441 F.3d at 131.  To determine whether the
Government has carried its burden on this issue, a court must
consider "the totality of all the circumstances" in which the
consent was given, id. (citation omitted); see also Ohio v.
Robinette, 519 U.S. 33, 40 (1996), including, where applicable,
the "vulnerable subjective state of the person who consents."
Schneckloth, 412 U.S. at 229.  The Government need not
demonstrate, however, that the person giving consent had
"knowledge of a right to refuse," although that "is a factor to

---

[5] See also Schneckloth, 412 U.S. at 227 ("[T]wo competing
concerns must be accommodated in determining the meaning of a
'voluntary' consent -- the legitimate need for such searches and
the equally important requirement of assuring the absence of
coercion.").

be taken into account." Id. at 249.  Indeed, in light of the
"endless variations in the facts and circumstances implicating
the Fourth Amendment," the Supreme Court has specifically
rejected any such "litmus-paper test." Robinette, 519 U.S. at
39 (citation omitted).

In this case, the most notable of the circumstances
accompanying Montes-Reyes's oral consent for the agents to enter
and search his room is, of course, the manner in which that
consent was sought.  It is not alleged that force or an express
or implied threat of force was used to obtain Montes-Reyes's
consent.  Agent Luna did not, however, simply ask Montes-Reyes
if he could conduct a search of his room.  Instead, after
identifying himself as a law enforcement agent and showing him
an NYPD detective's badge, Agent Luna told Montes-Reyes that he
was looking for a missing girl, showed him an "Endangered
Missing" flier that included a picture of a missing four-year-
old girl, and asked if he could look in his room to see if the
girl was inside.  It was in response to this display and this
inquiry that Montes-Reyes gave his consent for Agent Luna to
enter and search.  Thus, the question presented here is whether
consent given under these circumstances can be considered
"voluntary" or "the product of an essentially free and
unconstrained choice." Schneckloth, 412 U.S. at 223, 225.

9

B.    Prior Cases Addressing Consent and Deception

In seeking to answer this question, each side has attempted to identify prior cases in this and other circuits addressing the voluntariness of the consent provided following a police ruse or misrepresentation, and argued that the instant case is analogous to the cases they have discovered.  In their efforts to identify cases favoring their position, however, the parties' have overlooked what a review of the case law as a whole makes clear: that the fundamental question -- was the defendant's consent voluntary in light of all of the facts and circumstances? -- does not change simply because one of those "circumstances" is the use of a deceptive tactic by law enforcement.  Given the parties' positions, such a review is helpful prior to applying this principle to the case at hand.

It should also be noted at the outset that while the examination of voluntariness applies to every consensual search, whether the consent is given to an officer working in an undercover capacity or to one whose identity as a law enforcement officer is plainly disclosed, the examination is particularly important when the officer's identity is disclosed. Law enforcement officers are representatives of the government and figures of authority in the community.  "It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement."

10

Schneckloth, 412 U.S. at 232 (citation omitted). Consequently, the cases that prove most instructive for our purposes are those in which, as here, an officer who has revealed his identity employs a ruse to obtain consent to search.

Cases in which consent to search was provided following a police ruse or misrepresentation may be usefully viewed as falling into three categories.[6] In the first category are cases in which the person whose consent is sought is left with the impression that his consent cannot be lawfully withheld. It is universally agreed that, in such circumstances, the resulting consent is not "the product of an essentially free and unconstrained choice." Id. at 225. Examples include cases in which law enforcement agents falsely claim that they already possess a warrant to search the premises, see Bumper v. North Carolina, 391 U.S. 543, 550 (1968), or falsely claim to be pursuing some otherwise permissible regulatory purpose, see, e.g., United States v. Bosse, 898 F.2d 113, 115 (9th Cir. 1990)

---

[6] Cases in which deception is used in order to execute an arrest warrant, e.g., United States v. Alejandro, 368 F.3d 130, 136 (2d Cir. 2004), or search warrant, e.g., United States v. Vargas, 621 F.2d 54, 56 (2d Cir. 1980), or where police already have a right to search pursuant to another exception to the warrant requirement, e.g., United States v. Howard, 489 F.3d 484, 492-94 (2d Cir. 2007) (automobile exception); United States v. Scopo, 19 F.3d 777, 780, 785 (2d Cir. 1994) (traffic stop supported by probable cause), address a related, but clearly distinguishable issue, and are thus not considered here. The issue addressed herein is the use of deception to generate the authority to search (i.e., consent), not simply to facilitate the exercise of authority already obtained from another source.

11

(ATF agent, without identifying himself, accompanied state regulator on licensing inspection);[7] see also United States v. Hampton- El, No. 93 Cr. 181, 1994 WL 708156, *7-8 (S.D.N.Y. Dec. 20, 1994) (Mukasey, J.) (expressing doubt as to Fourth Amendment validity of consent search where officer claimed to be a building inspector checking for unauthorized construction). Bumper is the foundational case on this point. In that case, an elderly woman was told by police officers that they had a warrant to search her home, and she agreed to let them in. Despite her testimony that she "had no objection to them making

---

[7] The Ninth Circuit has articulated a broader, per se rule that "access gained by a government agent, known to be such by the person with whom the agent is dealing, violates the fourth amendment's bar against unreasonable searches and seizures if such entry was acquired by affirmative or deliberate misrepresentation of the nature of the government's investigation." United States v. Little, 753 F.2d 1420, 1438 (9th Cir. 1984). This approach appears to have been adopted by several other courts. SEC v. ESM Government Secs., Inc., 645 F.2d 310, 316 (5th Cir. 1981) ("We think it clearly improper for a government agent to gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust."); Pennsylvania v. Slaton, 608 A.2d 5, 9 (Pa. 1992) ("[D]eception amounts to implied coercion, which negates the necessary element of willingness."); cf. United States v. Escobar, 389 F.3d 781, 786 (8th Cir. 2004) ("The misrepresentation may even invalidate the consent if the consent was given in reliance on the officer's deceit.") (citation omitted). Although Montes-Reyes has relied on such cases here, it is unnecessary to decide in this case whether such a per se rule is appropriate or applicable -- a result that may be questioned in light of Robinette's rejection of "litmus-paper test[s]" in this context, 519 U.S. at 39 -- because the suppression motion may be granted through a direct application of the Schneckloth voluntariness standard.

a search of my house," and that the decision to let the police
into the home "was all my own free will," Bumper, 391 U.S. at
547 n.8 -- and hence "voluntary" in a certain sense -- the Court
held that the search violated the Fourth Amendment.  The Court
reasoned that "[w]hen a law enforcement officer claims authority
to search a home under a warrant, he announces in effect that
the occupant has no right to resist the search.  The situation
is instinct with coercion -- albeit colorably lawful coercion.
Where there is coercion there cannot be consent." Id. at 550;
see also Schneckloth, 412 U.S. at 233-34.

        In the second category are cases in which the agents --
acting undercover or in uniform -- inform the person from whom
consent is sought of certain dire or otherwise exigent
circumstances and request permission to enter or search the
premises purportedly for the purpose of investigating or
addressing those circumstances.  As noted in a leading treatise,
in such cases, where "the police misrepresentation of purpose is
so extreme," a person is "deprive[d] . . . of the ability to
make a fair assessment of the need to surrender his privacy,"
and therefore the resulting "consent should not be considered
valid."  Wayne R. LaFave et al., Criminal Procedure § 3.10(c)
(3d ed. 2007).  The leading example[8] is provided by United States

---

[8] Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth
Amendment § 8.2 (2007) (noting that the gas leak scenario "is

v. Giraldo, 743 F. Supp. 152 (E.D.N.Y. 1990), in which agents disguised as gas company workers asked permission to enter to check for a gas leak.[9]  Id. at 153.  The resulting consent was considered involuntary under these circumstances because the "defendant was led to believe there was a life-threatening emergency," and that his consent to search was required to prevent a impending calamity.  Id. at 154.  "Defendant's only 'free choice'" given the scenario presented to him "was to have refused entry to the 'gas company' and risk blowing up himself and his neighbors."  Id.[10]

the illustration which is commonly put to show a form of deception which ought not be tolerated").

[9] For an example in this category involving a uniformed officer, see Krause v. Kentucky, 206 S.W.3d 922 (Ky. 2006), in which the officer knocked on defendant's door at 4:00 a.m., falsely claimed "that a young girl had just reported being raped by [defendant's roommate] in the residence," and "asked if he could look around in order to determine whether her description of the residence and its furnishings was accurate."  Id. at 294. "Stunned and sure that they were not the perpetrators of this heinous crime (since in fact, it never occurred), Appellant and his roommate made a split second decision to allow [the officer] into the residence in order to assist the trooper in his investigation."  Id. at 926.

[10] Such cases have also taken note of the potential public policy hazard created when police officers make false claims of exigent circumstances:

    In order to ensure cooperation in truly life-
    threatening situations, it is vital to maintain the
    public trust in emergency services.  When the police
    or the gas company come to the door warning of a real
    gas leak or other life-threatening emergency, it is in
    everyone's interest that they be believed.
    Sanctioning the type of deception engaged in here
    would send a message to all those with reason to fear

In the final category are cases in which consent was found
to be voluntary despite some form of deception by law
enforcement.  This category, however, is almost exclusively
populated by cases in which the deception in question was the
use of an undercover agent who obtained otherwise voluntary
consent through the use of his adopted identity.  Such cases
follow Lewis v. United States, 385 U.S. 206 (1966), in which the
Court stated that "in the detection of many types of crime, the
Government is entitled to use decoys and to conceal the identity
of its agents."  Id. at 209.  Despite this broad language --
relied upon by the Government here -- the cases cited in the
first two categories make clear that Lewis cannot stand for the
general proposition that deceptive tactics never render consent
involuntary; rather, Lewis and similar cases must be read as
endorsing the more limited proposition that "consent is not
vitiated merely because it would not have been given but for the
nondisclosure or affirmative misrepresentation which made the
consenting party unaware of the other person's identity as a
police officer or police agent."  LaFave, Search and Seizure §

---

"the system" (whether they be law abiding or law
breaking) that emergency warnings cannot be trusted.
Giraldo, 743 F. Supp at 154; see also Krause, 206 S.W.3d at 927
("What distinguishes this case most, perhaps, from the bulk of
other ruse cases is the fact that [the officer] exploited a
citizen's civic desire to assist police in their official duties
for the express purpose of incriminating that citizen.")

8.2 (discussing <u>Lewis</u>, <u>Hoffa v. United States</u>, 385 U.S. 293 (1966), and <u>On Lee v. United States</u>, 343 U.S. 747 (1952)).  In <u>Lewis</u>, an officer posing as a customer looking to buy illegal drugs was invited to the home of the defendant in order to purchase drugs from him.  The Court allowed the evidence thus obtained -- the bags of drugs and the statements made during the purchases -- to be admitted, noting that (1) "the petitioner invited the undercover agent to his home for the specific purpose of executing a felonious sale of narcotics," and (2) "the agent [did not] see, hear, or take anything that was not contemplated, and in fact intended, by [the defendant] as a necessary part of his illegal business."  <u>Id.</u> at 210.[11]  The Court concluded, in sum, that "[a] government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant."  <u>Id.</u> at 211.[12]

---

[11] Also notable was the fact that the defendant had "converted [his home] into a commercial center to which outsiders are invited for purposes of transacting unlawful business."  <u>Lewis</u>, 385 U.S. at 211.  Under those circumstances, the Court held, "that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street."  <u>Id.</u>

[12] The Court further noted that to hold otherwise would "come near to a rule that the use of undercover agents in any manner is virtually unconstitutional per se," which would "severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims who either cannot or do not protest," the "prime example" being "narcotics traffic."  <u>Id.</u> at 210.

Thus, provided that the undercover agent does not exceed the objectively reasonable scope of the consent provided, <u>see generally</u> <u>Florida v. Jimeno</u>, 500 U.S. 248, 251 (1991), courts have applied this principle in admitting evidence gathered by undercover agents who obtained voluntary consent to enter a premises or to stand in a position from which the interior of a premises might be viewed. Notably, nearly all of the cases cited by the Government in support of the voluntariness of Montes-Reyes's initial consent in this case address such scenarios, including <u>United States v. Scherer</u>, 673 F.2d 176, 181 (7th Cir. 1982) (agent posing as cousin of an informer), <u>United States v. Wright</u>, 641 F.2d 602, 604 (8th Cir. 1981) (officers posing as fellow motel residents with car trouble in order to obtain plain view of suspect's room from the doorway), <u>United States v. Raines</u>, 536 F.2d 796, 798 (8th Cir. 1976) (officer posing as friend of defendant's drug associate), and <u>United States v. Glassel</u>, 488 F.2d 143, 145 (9th Cir. 1973) (officers posing as drug purchasers).[13]

---

[13] Courts have likewise permitted officers to use a ruse to get a door opened where the officers promptly identified themselves as law enforcement before entering the premises. In <u>Brown v. State</u>, 835 A.2d 1208 (Md. 2003), relied upon by the Government here, the officer knocked on the door and "represent[ed] himself as a maintenance person desirous of checking the thermostat," but by this deception "induced nothing more than the opening of the door." <u>Id.</u> at 635. "As soon as the door was opened," the officer "displayed his police badge, identified himself as a police officer, and asked if he could come in and talk with

Of course, as Giraldo indicates, simply because a deceptive tactic is used by an undercover rather than a uniformed officer, it does not follow that the consent given was voluntary.[14] Conversely, not every case in which a uniformed officer misrepresents the purpose of his search in order to obtain consent will the evidence thereby obtained be suppressed, although such cases appear to be quite rare.[15]  One of the few examples of such a case is provided by United States v. Andrews, 746 F.2d 247 (5th Cir. 1984), overruled on other grounds by United States v. Hurtado, 905 F.2d 74 (5th Cir. 1990).  In Andrews, the defendant told the police that he possessed two sawed-off shotguns; the police asked to see the guns, claiming that "a person fitting Andrews'[s] description had been connected to various robberies in which a sawed-off shotgun was employed."  Id. at 248.  Andrews agreed, and was permitted to drive fifty miles in his own vehicle (with the police following behind) to take the officers to see the guns.  What Andrews did not know, however, is that the robbery story was a ruse, and

---

[14] appellant."  Id. at 359.  Under these circumstances, the court considered the consent that followed this limited deception to be voluntary.

[14] For example, it could hardly be doubted that, under Lewis and Schneckloth, an undercover officer could not pose as an armed robber and gain entry into a dwelling by drawing a gun and forcing the inhabitants to allow him to enter.

[15] Under the per se rule endorsed by the cases cited supra, however, such an outcome would be an impossibility.

that the officer's true "purpose in asking to inspect the
shotguns was to" obtain evidence "so that Andrews could be
charged with the crime of illegal possession of a firearm by a
felon." Id.  While noting that "Andrews'[s] [suppression] claim
has substantial merit," the court found, based on the
circumstances presented -- e.g., Andrews, although not under
arrest, had been informed of his Miranda rights; he had been
told he was "free to go" prior to driving back to his home; he
had not been threatened in any way; and, "two hours passed
between Andrews'[s] initial consent and the actual production of
the guns," during the last hour of which "Andrews was alone in
his own personal vehicle," id. at 249-50 -- that Andrews's
consent was voluntary despite the ruse.  While noting that "any
misrepresentation by the Government is a factor to be considered
in evaluating the circumstances," the court concluded that the
case was devoid of "any evidence that Andrews'[s] will was
overborne." Id. at 250.

    In sum, the case law demonstrates that a deceptive law
enforcement tactic -- whether used by an undercover or a
disclosed law enforcement officer -- does not itself require or
preclude a finding that an authorized person voluntarily
consented to a search.  Rather, "the totality of all the
circumstances," Snype, 441 F.3d at 130 (citation omitted) --
including, naturally, the nature of the deception used -- must

still be considered in determining whether such consent was
voluntarily given.[16]


C.    The "Missing Girl" Ruse

        Based on the facts found at the April 7 hearing and the
Fourth Amendment standards described above, the consent Montes-
Reyes gave to Agent Luna cannot be considered voluntary, as the
"missing girl" ruse used by Agent Luna created a false sense of
exigent circumstances similar to that raised in a "gas leak"
scenario.  The Government's attempts to distinguish these two
scenarios are unavailing.

        First, the Government emphasizes that, unlike a ruse
involving a gas leak, Agent Luna's ruse did not lead Montes-
Reyes to believe that his own safety was at risk.  The message
conveyed, however, by Agent Luna's misrepresentation and his
display of the "Endangered Missing" poster -- i.e., that a four-
year-old girl is lost and, necessarily, in serious danger --
must be considered no less alarming.  A false claim of a missing

---

[16] See United States v. Carter, 884 F.2d 368, 375 (8th Cir. 1989)
(noting that "deception is [not] completely irrelevant," but
"may be considered along with other factors as part of the
totality of circumstances"); see also United States v. Peters,
153 F.3d 445, 464 (7th Cir. 1998) (Easterbrook, J., concurring)
("[L]ack of candor about the purpose of an investigation is no
more fatal to a consent search than it is to a confession -- and
that in either case the court of first instance must take all of
the circumstances into account."); cf. Lewis, 385 U.S. at 208
("[T]he particular circumstances of each case govern the
admissibility of evidence obtained by stratagem or deception.").

child is precisely the kind of "extreme" misrepresentation of investigatory purpose by which a person is "deprive[d] . . . of the ability to make a fair assessment of the need to surrender his privacy."  LaFave et al., Criminal Procedure § 3.10(c). Indeed, federal law and the laws of all fifty states recognize both that the problem of missing children is a profoundly serious one and that private persons may be counted on to assist law enforcement in locating such children.  See Prosecutorial Remedies and Other Tools To End the Exploitation of Children Today (PROTECT) Act of 2003, tit. III, Pub. L. No. 108-21, 117 Stat. 650, 660-67 (providing federal standards and oversight for the AMBER Alert system used to find missing children); Press Release, Dep't of Justice, AMBER Alert Plans in Place in All 50 States (Feb. 17, 2005), available at http://www.amberalert.gov/ newsroom/pressreleases/ojp_05_0217.htm ("No matter where a child is missing, concerned Americans stand ready to help.").  Thus, the fact that it was the four-year-old girl pictured on the flier and not Montes-Reyes himself that was supposedly endangered is of little significance.

Second, the Government argues that Montes-Reyes knew that there was no girl is his room, and thus he could have withheld his consent safe in the knowledge that he was not thereby endangering anyone.  To the contrary, Montes-Reyes would have had every reason to believe that his failure to consent to the

21

search would hinder or delay the efforts to resolve safely (what appeared to be) a grave emergency about which the authorities were sufficiently concerned that they dispatched a squad of agents to investigate. In such a scenario, the decision to allow the police into the premises cannot be "the product of an essentially free and unconstrained choice." Schneckloth, 412 U.S. at 225 (citation omitted).

This is not to underestimate the difficulty of "ferreting out those organized criminal activities," such as drug trafficking, "that are characterized by covert dealings with victims who either cannot or do not protest." Lewis, 385 U.S. at 210. But, as the Court recognized long ago in Boyd v. United States, 116 U.S. 616 (1886),

> [i]t may be that it is the obnoxious thing in its
> mildest and least repulsive form; but illegitimate and
> unconstitutional practices get their first footing in
> that way, namely: by silent approaches and slight
> deviations from legal modes of procedure. . . . It is
> the duty of courts to be watchful for the
> constitutional rights of the citizen, and against any
> stealthy encroachments thereon.

Id. at 635 (quoted in Schneckloth, 412 U.S. at 228-29). With this admonition in mind, and recognizing the need to "reconcil[e] the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion," Schneckloth, 412 U.S. at 229, it must be concluded

that Montes-Reyes did not "voluntarily" consent to the search of
his room.


II.  Subsequent Consents to Search

     The conclusion that Montes-Reyes did not give voluntary
consent for Agent Luna and his fellow law enforcement officers
to enter and search his room does not end the inquiry, however,
as Montes-Reyes also later consented in writing to the search of
"room 814," and orally consented to the search of his bag.
Whether these subsequent expressions of consent provide an
independent basis for the admission of the evidence obtained
from that search must be separately considered.

     "When a consent to search follows an illegal entry, this
circuit requires the government to show more than the
voluntariness of the consent; it must also demonstrate that 'the
taint of the initial entry has been dissipated' in order to
admit evidence seized following the illegal entry."  Snype, 441
F.3d at 132 (citing United States v. Oguns, 921 F.2d 442, 447
(2d Cir. 1990)).  As with the initial "voluntariness" inquiry,
the question of whether a later consent "has been purged of the
taint of prior official illegality . . . 'must be answered on
the facts of each case.'"  Id. at 134 (quoting Brown v.
Illinois, 422 U.S. 590, 603 (1975)).  "Demonstrating such
purgation is, of course, a function of circumstantial evidence,

with the burden of persuasion on the State." Kaupp v. Texas,
538 U.S. 626, 633 (2003).

"The Supreme Court has identified the following factors as
relevant to" the question of whether the initial taint has
dissipated: "(1) the giving of Miranda warnings, (2) the
temporal proximity of the illegal entry and the alleged consent,
(3) the presence of intervening circumstances, and (4) the
purpose and flagrancy of the official misconduct." Snype, 441
F.3d at 134 (citing Kaupp, 538 U.S. at 633).  Where a defendant
is not in custody, as here, the first factor is less relevant,
and a court may "focus on the remaining factors." Id.

Regardless of whether the use of the "missing girl" ruse
can be considered "flagran[t] . . . official misconduct," id.,
the second and third factors themselves necessitate a finding
that the taint of the initial entry had not dissipated at the
time Montes-Reyes gave either his written or oral consent.  With
respect to "temporal proximity of the illegal entry and the
alleged consent," id., Agent Luna testified that, after Montes-
Reyes gave his initial consent to enter, he looked around for
only a matter of "seconds" before he began questioning him about
the presence of firearms and sought Montes-Reyes's written and
oral consent,[17] and it is apparent that the entire process only

---

[17] It was not entirely clear from the evidence presented whether
Montes-Reyes signed the consent form before or after his oral

took a few minutes.  Such a short interval "did little to dissipate the taint of the illegal entry." Oguns, 921 F.2d at 447.  With respect to "the presence of intervening circumstances," Synpe, 441 F.3d at 134, neither Agent Luna nor Investigator Fernandez identified any events of significance that took place during this brief span of time.

The Government argues, however, that the signing of the consent form itself is an intervening event entitled to considerable weight.  Comparison to Oguns, on which the Government principally relies on this point, is instructive.  In that case, as here, there was only a "short lapse of time between the illegal entry and consent, amounting only to a few minutes." Oguns, 921 F.2d at 447.  "Within this short period of time, however," several significant events took place.  Id. During these "few minutes," the officer (1) "deliberately read Oguns his Miranda rights, stopping after each right to ensure that Oguns understood"; and (2) "read to Oguns a consent to search form," that "not only [informed] the defendant [that he] has a right to refuse to consent to a search and demand a warrant, but also advise[d] him that any items found can be used against him, he may consult an attorney before or during the

_____

consent to search the bags.  Given the brief time periods
involved, the precise order of events is not significant.

search, and he may withdraw his consent to search at any time

prior to its conclusion." Id. 447-48 & n.1.

Here, by contrast, Montes-Reyes was not read his Miranda

rights until he was under arrest, after the bag had already been

searched and its incriminating contents discovered.  Moreover,

neither Agent Luna nor the consent form advised Montes-Reyes of

his right to refuse consent to a further search of his room or

his bag, or of any of the other rights of which Oguns was

informed.[18]  Although Schneckloth, 412 U.S. at 2234-37, holds

that it is not necessary for a person to be advised of his right

to refuse for the consent given to be "voluntary," Oguns makes

clear that being advised of one's rights may be a significant

intervening event that contributes toward the dissipation of an

initial taint.  Finally, it must be noted that, because the

agents never informed Montes-Reyes that he had been tricked into

giving his earlier consent, it could only have been when (1) he

was handed the consent form, which made reference to "agents of

the Drug Enforcement Agency," and (2) Agent Luna expressed an

interest in looking for guns in his bag, that Montes-Reyes could

have begun to discover that he had been duped.  Thus, not only

was the taint not dissipated at the time of the written and oral

---

[18] Although there is no evidence in the record of the defendant's
inability to read the form, which was provided to him in
Spanish, it may be noted that the officers did not read the form
aloud to him.

consents, it was only just becoming apparent to the defendant.
In addition, as it was dawning on Montes-Reyes that the agents
had deceived him to gain entry into his room, the agents gave
him no reason to believe that he could trust them to honor a
request that they leave his room before they searched for
whatever had brought them there.

The scenario presented here also provides a stark contrast
to United States v. Montoya, 760 F. Supp. 37 (E.D.N.Y. 1991),
upon which the Government likewise relies.  In that case, the
police also entered using a ruse,[19] and then obtained valid
consent through the signing of a consent form.  In Montoya,
however, the officer was "scrupulous at the moment he came into
the apartment to tell Montoya the nature of the investigation
and advise him of his Miranda rights.  After receiving Montoya's
initial oral consent and presenting him with a written consent
to search form, [the officer] assured him that the officers
would not search if Montoya did not sign."  Id. at 40.  The
"scrupulous" efforts to dissipate the taint caused by the

---

[19] The officer identified himself at the door, but "then told a
fictitious story that there had been accident involving a female
who had a piece of paper containing Montoya's name, address, and
telephone number.  [Officer] Platzer asked 'would it be all
right, I didn't have all the details, but could we go upstairs
to your apartment and talk about it.'"  Montoya, 760 F. Supp. at
38.  The court held that it "need not determine the validity of
the initial entry into Montoya's apartment," because any
illegality caused by the ruse "did not so taint Montoya's
[later] written consent as to make the consent illegal."  Id. at
40.

initial ruse in Montoya provide a sharp contrast to the record here.

In short, it cannot be said that, at the time Montes-Reyes gave his oral and written consent to search the room and his bag, "the taint of the initial entry ha[d] been dissipated." Snype, 441 F.3d at 132 (citation omitted). Thus, even assuming that those expressions of consent were themselves "voluntary," the evidence obtained following the search of Montes-Reyes's bag must be suppressed. Id.

III. Statements Made Before and After Miranda Warnings

Montes-Reyes's motion to suppress also encompasses the statements he made prior to and after his arrest on December 19, 2007. Relying on Brown v. Illinois, 422 U.S. 590 (1975), he argues that these statements were the fruit of the illegal entry and search of his room. "For the statements to be admissible, 'the causal chain,'" between the illegal search and the statements made "'must be broken, such that the statements were 'sufficiently an act of free will to purge the primary taint.'" United States v. Awadallah, 349 F.3d 42, 82 (2d Cir. 2003) (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963)).

Here, the Government has relied entirely on the argument that the taint of any illegal entry into Montes-Reyes's room had dissipated by the time he gave his written and oral consents

(and thus at the later time he made his statements), and has not provided any additional bases upon which the admission of the statements could be grounded.  The Government's contention regarding the dissipation of the initial taint has been rejected above, however.  Moreover, while it is true that prior to the second and third of Montes-Reyes's statements he had been advised of his <u>Miranda</u> rights, the Court in <u>Brown</u> held that "<u>Miranda</u> warnings, <u>alone</u> and <u>per se</u>, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession.  They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited." <u>Brown</u>, 422 U.S. at 603; <u>see also</u> <u>United States v. Pena</u>, 961 F.2d 333, 338 (2d Cir. 1992).  The Government not having offered any other basis for the admission of Montes-Reyes's statements, those statements will also be suppressed.

CONCLUSION

The defendant's motion to suppress the fruits of the search
of his hotel room on December 19, 2007, as well as statements
made prior to and following his arrest on that date, is granted.

SO ORDERED:

Dated:    New York, New York
          April 14, 2008

                                    _____
                                    DENISE COTE
                                    United States District Judge

30